Filed 11/12/25  In re Andres R. CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re ANDRES R., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E079972 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2200411) |
| v. | OPINION |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

A.R. (Father) appeals from the juvenile court's dispositional order adjudging his son, Andres R., a dependent of the court and removing the child from his custody. The court also ordered reunification services for Father. On appeal, Father challenges the sufficiency of the evidence supporting the court's jurisdictional finding and the removal order. He also argues that the Riverside County Department of Public Social Services (DPSS) failed to comply with state law implementing the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).

In the unpublished portion of a prior opinion, we held that substantial evidence supported the jurisdictional finding and the removal order. In the published portion of the prior opinion, we rejected Father's ICWA argument, concluding that DPSS did not err by failing to ask various extended family members about Andres's potential Indian ancestry.[1] (*In re Andres R.* (2023) 94 Cal.App.5th 828.) Our Supreme Court granted review and deferred further action pending consideration and disposition of *In re Ja.O.* (2025) 18 Cal.5th 271 (*Ja.O.*). While this matter was under review, Father and D.P. (Mother) appealed from the juvenile court's order terminating parental rights, and we affirmed that order in an unpublished opinion. (*In re Joseph P.* (May 19, 2025, E084575) [nonpub. opn.] (*Joseph P.*).)

The Supreme Court recently transferred this case back to us with directions to vacate our prior opinion and reconsider the appeal in light of *Ja.O.* We gave the parties

---

[1]     Because ICWA uses the term "Indian," we use it as well "to reflect the statutory language." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1125, fn. 1.) No disrespect is intended.

the opportunity to file supplemental briefs addressing matters arising after our previous decision. (Cal. Rules of Court, rule 8.200(b)(2).) Father filed a letter stating that he would not be submitting a supplemental brief in light of *Joseph P.* DPSS did not file a supplemental brief or otherwise respond to our order permitting supplemental briefs. Having complied with the Supreme Court's directions, we affirm.

BACKGROUND

I.      *Detention*

Father's one-year-old son, Andres R., came to DPSS's attention in May 2022, when Mother called law enforcement to report domestic violence. Mother reported that Father put her in a headlock and choked her. She freed herself from the headlock and tried to call law enforcement, but Father grabbed her phone and threw it. He then drove off. Mother put Andres and his two half-siblings in her car, which contained only one car seat, and chased Father's car. She called law enforcement during that chase. Andres and his half-siblings witnessed the altercation but were not injured.[2] Mother refused an emergency protective order.

The social worker went to the family's hotel room the following day. The family had been living at the hotel for two years. The front desk agent described Father as mean and aggressive with staff. A hotel guest said that he heard screaming inside the family's room the night before and again that morning. The social worker heard voices and a television inside the family's room, but no one answered the door for over an hour, so the

---

[2]      Mother is not a party to this appeal, nor are the fathers of Andres's half-siblings.

social worker called law enforcement to conduct a welfare check. Father opened the door when the officers knocked on it, but he attempted to close it when he saw them. Although Father resisted the officers, they eventually arrested him. Mother closed the hotel room door and refused to open it when the officers were dealing with Father. Father yelled to Mother that she should not open the door or come outside. One of the officers got a room key from hotel staff and tried to open the door, but the key did not work. The social worker later discovered that the parents had removed the batteries from the key reader on the door.

Mother came out of the hotel room after the officers took Father away. She told the social worker that Father was upset the day before because paternal grandfather had been killed. Father "got in her face," put her in a headlock, and choked her. She had red marks on both sides of her neck. She allowed Father to return to the hotel room after the incident because she loved him and he lived there. She described Father as a good man and a good father, and she said that yesterday was the first time "he ha[d] ever done anything like this."

Andres's half-sister, who was nearly six years old, told the social worker that Father was mad and threw Mother across the bed. He also hit Mother with his fist, which the child demonstrated by making a fist. Mother looked scared. The child could not remember what anyone had said. She told the social worker that she had seen Father hit Mother before. Andres's half-brother, who was nearly four years old, seemed not to

4

understand the social worker's questions and made no statements. Father refused to be interviewed for the detention report.

The social worker also reported on the condition of the family's hotel room and included photographs with the detention report. Trash and other things were all over the floor, and the room was very dark because the lights did not work. The social worker tripped twice as she was trying to navigate the room and asked Mother to open the curtains. The window had two large cracks in it, and the mirrored closet door was also cracked. The parents had divided the room by hanging a tarp across it. There were piles of boxes, bags, and other objects against every wall and a makeshift wall and a tall pile of items behind the couch. A makeshift fan was hanging from the ceiling in the bathroom, and the floor in there was also littered with trash, including acrylic paint bottles. The counter in the kitchenette area was covered with items, including a blade within the children's reach. The social worker asked Mother to clean up the room as much as possible so that the children did not trip or hurt themselves.

Mother told the social worker that she did not have any Indian ancestry. The worker was unable to ask Father about Indian ancestry because of his refusal to be interviewed.

DPSS applied for a protective custody warrant for the removal of the children under Welfare and Institutions Code section 340, and the court issued the warrant on the same day. (Unlabeled statutory citations are to the Welfare and Institutions Code.) DPSS also filed a petition under section 300, subdivision (b)(1), alleging in relevant part

5

that (1) the parents neglected Andres's health and safety because the family's residence (the hotel room) was "found in deplorable conditions," (2) Father abused controlled substances, (3) the parents engaged in ongoing acts of domestic violence in Andres's presence, and (4) Father had a criminal history, including an arrest and/or conviction for felony inflicting corporal injury on a spouse.

At the detention hearing in June 2022, Mother requested that the court issue an emergency protective order restraining Father. Her counsel stated that she did not agree to one earlier because she did not understand the request, but Mother was now "more than happy to do whatever" DPSS requested. Father objected to the request for an emergency protective order. He argued that the order was unnecessary because (1) he was in custody, and (2) the altercation was an isolated incident. Father's counsel indicated that Father might have Cherokee ancestry, and Father filed Judicial Council form ICWA-020 (Parental Notification of Indian Status) indicating that Andres might be eligible for membership in the Cherokee tribe.

The court detained Andres from the parents and issued a temporary restraining order (TRO) protecting Mother from Father. Additionally, the court found that ICWA may apply to Andres.

II.     *Jurisdiction and disposition*

DPSS again interviewed Andres's half-sister and Mother in preparation for the jurisdiction and disposition hearings. The half-sister reported that she saw Father "roll[]" Mother "all over the bed" and choke Mother. Mother asserted that Father had never "laid

6

a hand on" her before the choking incident and that he was upset because paternal grandfather had been murdered. She again asserted that Father had always been good to her and the children.

Father's counsel did not permit DPSS to interview him about the domestic violence allegations. However, Father answered questions about his social history and background. Father claimed to have Cherokee ancestry. Paternal grandmother reported that neither she nor paternal grandfather had Indian ancestry. Father said that he would do whatever was necessary to have Andres returned to his care. When the social worker asked about placement, Father responded: "'I don't like that they're trying to keep the kids together. I feel like my son was taken from me because of her [Mother] and her kids.'" He wanted DPSS to place Andres with paternal grandmother or paternal aunt. Paternal grandmother was willing to care for Andres and his half-siblings, so DPSS submitted a resource family referral on her behalf. After Father was released from custody, he had supervised visitation with Andres twice per week.

DPSS gave Father referrals for housing assistance, random drug testing, substance abuse treatment programs, parenting education, and domestic violence services at a mental health agency. Father drug tested negative and provided proof of enrollment in parenting education, anger management, and counseling services. He also provided a letter from a substance abuse treatment program stating that he did not meet the medical requirements for treatment.

At the jurisdiction hearing in July 2022, the parents requested that the court set the matter for contest, so the court continued the hearing. With respect to the TRO, Mother asked the court to allow the TRO to expire. The court granted that requested, and the TRO expired that day.

Father continued to visit Andres twice per week for two hours and was engaging in domestic violence services. He had taken three random drug tests with negative results and failed to appear for a fourth test. DPSS was waiting for Father's substance abuse and parenting education providers to confirm his attendance at those programs.

DPSS contacted the Cherokee Nation and asked whether the parents, paternal grandparents, or Andres were enrolled members of the tribe or eligible to enroll. The tribe responded that Andres was not an Indian child in relation to the Cherokee Nation.

DPSS amended the petition to allege the family's residence was "unsafe," rather than in deplorable conditions. The agency also amended the allegation about Father's criminal record to state that he had an arrest and/or conviction for misdemeanor inflicting corporal injury on a spouse, rather than an arrest and/or conviction for the felony offense.

The contested jurisdiction and disposition hearing occurred in August 2022. Father's counsel argued that the court should find the allegations of unsafe living conditions to be untrue because Father was not living at the hotel and went there only to help with Andres or to pick up the child. He also argued that there was no evidence to support the substance abuse allegation. Counsel noted that Father had pled to

8

misdemeanor inflicting corporal injury on a spouse, but he did not offer any specific arguments with respect to the domestic violence allegations.

The court struck the substance abuse allegation. But it found true the allegations that (1) the family's residence was unsafe, (2) the parents were engaged in ongoing domestic violence, and (3) Father had a misdemeanor conviction for spousal abuse. (The court also found true that Mother had an extensive criminal history and neglected the medical and educational needs of Andres and his half-siblings.) The court took jurisdiction over Andres on the basis of the sustained allegations.

As for disposition, DPSS had placed Andres with paternal grandmother a few days before the hearing. Father stated that he approved of Andres's placement with paternal grandmother and that he was "submitting on family reunification services."

The court made the required findings under section 361, subdivision (c)(1), by clear and convincing evidence and adjudged Andres a dependent of the court. It removed Andres from the parents' physical custody and ordered reunification services for both of them. The court found that DPSS had made reasonable efforts to eliminate the need for removal. The court also found that ICWA did not apply to Andres.

DISCUSSION

I.    *Sufficient evidence to support the jurisdictional finding*

Father argues that there was insufficient evidence to support the court's jurisdictional finding under section 300, subdivision (b)(1). We disagree.

9

Section 300, subdivision (b)(1)(A), authorizes a juvenile court to take jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness" as a result of the "failure or inability of the child's parent or guardian to adequately supervise or protect the child." The statutory definition requires DPSS to demonstrate three elements by a preponderance of the evidence: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

Section 300 generally requires proof that the child is subject to the defined risk of harm at the time of the jurisdiction hearing, but the court need not wait until the child is seriously injured to take jurisdiction. (*In re N.M.* (2011) 197 Cal.App.4th 159, 165; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.) "The court may consider past events in deciding whether a child presently needs the court's protection." (*In re N.M.*, *supra*, at p. 165.) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Domestic violence between a child's parents may support a jurisdictional finding "'if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm.'" (*In re L.O.* (2021) 67 Cal.App.5th 227, 239.)

A challenge to the sufficiency of the evidence supporting a jurisdictional finding requires us to determine if substantial evidence, contradicted or not, supports it. (*In re*

*I.J.* (2013) 56 Cal.4th 766, 773.)  We draw all reasonable inferences from the evidence to support the finding and review the record in the light most favorable to the court's determination.  (*Ibid.*)  We do not reweigh the evidence or exercise independent judgment but merely determine whether the evidence is sufficient to support the finding. (*Ibid.*)

As a preliminary matter, DPSS urges us to reject Father's challenge because he does not challenge the jurisdictional findings based on Mother's conduct.  When the juvenile court takes jurisdiction on multiple grounds, we may affirm the court's finding of jurisdiction if any single ground is supported by substantial evidence.  (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  We "'need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*Ibid.*) However, we will address the merits of a challenge to any jurisdictional finding that forms the basis for dispositional orders also challenged on appeal.  (*In re D.P.* (2023) 14 Cal.5th 266, 278, 283 (*D.P.*).)  That is the case here:  Father challenges the dispositional order removing Andres from his custody, which is based on the sustained allegations of domestic violence and unsafe living conditions.  We therefore reject DPSS's argument.

We also reject DPSS's argument that Father forfeited his substantial evidence challenge by failing to specifically contest the allegations of domestic violence.  At the jurisdiction hearing, Father's counsel opened by stating that Father's "general denials continue."  Counsel made specific arguments about the allegations of unsafe living conditions and the substance abuse allegation.  Counsel then stated that Father was

11

"submit[ting] on jurisdiction . . . with those arguments." But none of that forfeited Father's substantial evidence challenge. "[W]hen a parent submits or acquiesces on a particular record, 'the court must nevertheless weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been proved.'" (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464.) And "[e]ven if the parent does not contest the state of the evidence, he or she preserves the right to challenge it as insufficient." (*Ibid.*) Father thus preserved his substantial evidence challenge.

As for the merits of the challenge, the record contains substantial evidence supporting the court's jurisdictional finding. According to Mother, Father choked her, put her in a headlock, and threw her phone. The social worker observed red marks on Mother's neck the day after the altercation. Andres's half-sister reported that Father threw Mother across the bed and hit her with his fist. The half-sister had seen Father hit Mother on other occasions. Although Father had engaged in some domestic violence services by the time of the jurisdiction hearing, there was no information about his progress in those services. And Father refused to discuss the domestic violence allegations with DPSS. There was thus no evidence about what had caused Father to be violent from his perspective, whether he had any meaningful insights about the violence, or whether he had effectively resolved the issue. Instead, Father demonstrated a lack of insight about the issue when DPSS asked about placement—he said that he felt Andres was taken from him because of Mother and her children. Moreover, the parents appeared to be together still. Mother allowed Father to return to the hotel room just after the

12

altercation. She eventually asked the court for a TRO but then asked the court to let the TRO expire. At the time of the jurisdiction hearing, both parents were still using the hotel room as their mailing address. On this record, the court could reasonably infer that domestic violence between the parents was likely to continue in the absence of court supervision.

The court could also reasonably infer that the violence between the parents placed Andres at substantial risk of serious physical harm. He and his half-siblings were present during the altercation and could have easily been injured when Father threw Mother across the bed and threw her cell phone. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194 [children were at risk of physical harm from domestic violence "since, for example, they could . . . be accidentally hit by a thrown object, by a fist, arm, foot or leg, or by [the victim] falling against them"].) Andres also could have been injured when Mother put the children in the car and chased after Father. The court did not need to wait until Andres was actually injured to take steps to protect him.

In sum, substantial evidence supports the court's jurisdictional finding based on domestic violence between the parents. We need not consider whether the evidence of unsafe living conditions also supported jurisdiction.[3] (*In re D.P.*, *supra*, 14 Cal.5th at

---

[3]    In any event, Father's only argument with respect to the living conditions is that the parents were no longer living in the hotel room. Father does not cite to the record for that assertion, and our review of the record discloses no support for the claim. As noted, the parents were still using the hotel room as their mailing address. If they were living elsewhere or their living conditions had changed, the record does not reflect that.

13

pp. 283-284 [validity of one jurisdictional finding against a parent renders moot any challenges to other jurisdictional findings against the same parent].)

II.     *Sufficient evidence to support the removal order*

Father also challenges the sufficiency of the evidence to support the order removing Andres from his custody.  The argument lacks merit.

To order a child removed from their parents' physical custody, the juvenile court must find by clear and convincing evidence that (1) there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child in the parents' home, and (2) "there are no reasonable means by which the [child's] physical health can be protected without" removal.  (§ 361, subd. (c)(1).)  We review those findings for substantial evidence (*In re R.T.* (2017) 3 Cal.5th 622, 633), taking into account the level of confidence that the "clear and convincing" standard demands (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995).  The question before us "is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Id.* at pp. 995-996.)  We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at. p. 996.)

DPSS again urges us to conclude that Father forfeited his substantial evidence challenge.  The agency reasons that Father forfeited the issue by "submitting on family

14

reunification services." DPSS relies on case law holding that a parent forfeited her challenge to removal by submitting on the social worker's recommendation to remove the children. (*In re Richard K.* (1994) 25 Cal.App.4th 580, 587-591.) We are not persuaded. Father did not say that he was submitting on the social worker's recommendation (which was removal), nor did he say that he was submitting on removal. His submission could reasonably be construed as an agreement to participate in reunification services only if the court removed Andres from his custody. We also note that in general substantial evidence challenges are not forfeited by failure to raise them in the trial court. (*In re R.V.* (2012) 208 Cal.App.4th 837, 848; *In re Javier G.*, *supra*, 137 Cal.App.4th at p. 464.) In the absence of an unequivocal statement that Father was submitting on removal or on DPSS's recommendation, we decline to find that Father forfeited his challenge to the removal order.

On the merits, however, Father's substantial evidence challenge fails. He argues that there was insufficient evidence of a substantial danger to Andres because Father was engaged in services and his attack on Mother was a one-time event. The argument ignores all of the contrary evidence and reasonable inferences supporting the removal order. Andres's half-sister had seen Father hit Mother before the most recent incident. Father attacked Mother in Andres's presence. Andres was only one year old and likely would have been unable to protect himself from any unintended consequences of such an attack, like an object thrown in his direction. Further, Father's mere participation in services did not show that there was no danger to Andres. There was no evidence that

15

Father was benefitting from the domestic violence services, given the lack of information about his progress and his failure to discuss the issue with DPSS. And the court could reasonably infer that domestic violence remained a danger, because the parents were still in a relationship and living together. They were using the same hotel address for purposes of this case, and Mother asked the court to let the TRO expire. On the whole, substantial evidence supports the conclusion that Father's violence against Mother posed a substantial danger to Andres's physical or emotional well-being.

Substantial evidence also supports the conclusion that there were no reasonable means to protect Andres short of removal. Father proposes alternative means that he claims would have sufficiently protected Andres. He suggests that the court could have placed Andres in his custody on condition that he live with Andres at paternal grandmother's home, or the court could have allowed Mother to retain custody. Father also suggests that the court could have issued a mutual stay-away order and ordered unannounced home visits by DPSS.

But the record supports a reasonable inference that alternative means would not have sufficiently protected Andres. First, section 361 requires the court to consider two options as reasonable means to protect the child: (1) removing an offending parent from the home, and (2) allowing a nonoffending parent to retain physical custody, so long as that parent presents a plan showing that they can protect the child from future harm. (§ 361, subd. (c)(1)(A)-(B).) Neither parent was nonoffending in this case, and even if

16

they were, neither parent presented a plan about how they would protect Andres from future harm.

Second, placing Andres in Father's custody would have required Father to cooperate fully with DPSS, and Father overlooks the evidence that he and Mother were not fully cooperative with DPSS. When the social worker first visited the family home, the parents refused to open the door for over an hour. They took the batteries out of the key reader on the door so that the social worker and officers could not enter with the key provided by hotel staff. Father eventually opened the door and resisted the officers' attempts to get him out of the room. Once they did so, Father yelled for Mother to remain in the room. She only came out after the officers took Father away. Father refused to be interviewed at all for the detention report, and he refused to answer questions about the primary issue in this case—domestic violence—for the jurisdiction and disposition report.

Third, without any information from Father about the domestic violence or from his service provider about Father's progress, the court could not know whether the same issue would arise even if Father were living apart from Mother. Under all of these circumstances, the court reasonably concluded that there were no reasonable means to protect Andres short of removal.

Father also argues that the record does not contain sufficient evidence that DPSS made reasonable efforts to prevent or eliminate the need for removal. (§ 361, subd. (e) ["The court shall make a determination as to whether reasonable efforts were made to

17

prevent or to eliminate the need for removal of the minor from their home . . ."].) In particular, he claims that DPSS failed to adequately investigate or propose alternatives to removal like those he proposes on appeal.

Section 361 requires reasonable efforts, not perfect efforts, and substantial evidence shows that DPSS's efforts were reasonable here. (*In re H.E.* (2008) 169 Cal.App.4th 710, 725 ["reasonable efforts, like reasonable services, need only be reasonable under the circumstances, not perfect"].) After the detention hearing, DPSS provided Father with referrals for housing assistance, substance abuse treatment, drug testing, parenting education, and domestic violence services. The agency also facilitated visitation between Father and Andres. But given Father's refusal to address the domestic violence with DPSS, the suggestion that the agency should have done more to investigate placement in his home is not reasonable. The court therefore did not err by finding that DPSS made reasonable efforts.

For all of these reasons, we conclude that substantial evidence supports the court's removal order.

III. *Claimed ICWA error*

Father argues that DPSS failed to comply with the duty of initial inquiry under state law by failing to ask extended family members whether Andres might be an Indian child within the meaning of ICWA. (Former § 224.2, subd. (b); Stats. 2018, ch. 833, § 5.) Our prior opinion concluded that the duty to inquire of extended family members did not apply, because Andres was not taken into temporary custody under section 306—

18

he was taken into custody pursuant to a protective custody warrant under section 340. *Ja.O.* held that the "extended-family inquiry duty" applies even if a child was taken into custody pursuant to a protective custody warrant.[4] (*Ja.O.*, *supra*, 18 Cal.5th at p. 278.)

But we need not remand for DPSS to conduct an inquiry of extended family members. As we explained in *Joseph P.*, DPSS made extensive ICWA inquiries while this appeal was pending, including inquiries of extended family members. We rejected Father's claim of ICWA error in *Joseph P.*, and we concluded that the juvenile court did not abuse its discretion by finding that the ICWA investigation was adequate and proper. At this point, there is no further ICWA investigation to conduct. Because we cannot grant Father any effective relief, the issue is moot. (*D.P.*, *supra*, 14 Cal.5th at p. 276.)

## DISPOSITION

The dispositional order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

CODRINGTON
Acting P. J.

FIELDS
J.

---

[4]     *Ja.O.* interpreted the scope of the initial inquiry duty under former section 224.2, subdivision (b), which was in effect at the time of the disposition hearing in this case. (*Ja.O.*, *supra*, 18 Cal.5th at pp. 283-291.) Effective September 27, 2024, the Legislature amended section 224.2 to clarify that the extended-family inquiry duty applies regardless of whether the child is taken into temporary custody under section 306 or protective custody under section 340. (*Ja.O.*, at pp. 277, 280, 291.)

19